**Callman GOTTESMAN, Maria Mattiello, and Paul J. Peyser, Plaintiffs-Appellants,**

v.

**GENERAL MOTORS CORPORATION and E. I. Du Pont De Nemours & Company, Defendants-Appellees.**

**Nos. 304–306, Docket 32412–32414.**

United States Court of Appeals
Second Circuit.
Argued April 14, 1969.
Decided Aug. 13, 1969.

David Brady, New York City (O'Connor & Farber; Gordon, Brady, Caffrey & Keller, Netter, Netter, Dowd, Fox & Ness, Leo Brady, Clendon H. Lee, Arthur B. Netter, Henry L. Bayles, Abbott Gould, New York City, on the brief), for plaintiffs-appellants.

Daniel M. Gribbon, Wasihngton, D. C. (Covington & Burling, Washington, D. C., Littauer, Gordon, Ullman, Riseman & Ploscowe, New York City, Hugh B. Cox, Frank H. Gordon, New York City, Irving S. Shapiro, Wilmington, Del., on the brief), for defendant-appellee E. I. du Pont de Nemours & Co.

Edward B. Wallace, New York City (Ross L. Malone, William A. Grier, John R. Anderson, Detroit, Mich., John J. Higgins, New York City, on the brief), for defendant-appellee General Motors Corporation.

Before WATERMAN, SMITH and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

### I. *Background.*

Plaintiffs, minority stockholders of General Motors Corporation, appeal from a judgment for defendants General Motors and E. I. du Pont de Nemours & Company entered in the United States District Court for the Southern District of New York after a trial without a jury before Charles M. Metzner, J., 279 F. Supp. 361 (1967). Plaintiffs brought this derivative antitrust action in June 1957,[1] immediately after the Supreme Court's opinion in United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). That decision reversed a district court dismissal of an antitrust action brought against du Pont and General Motors, among others. The Court held that du Pont's commanding position as a supplier of automotive finishes and fabrics to General Motors, obtained at least in part by its ownership of a 23 per cent stock interest in General Motors, violated section 7 of the Clayton Act, 15 U.S.C. § 18, since acquisition of the stock raised a reasonable probability of the creation of a monopoly in that line of commerce. While the Government had also alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Court did not decide the appeal from the district court's dismissal of those charges. 353 U.S. at 588 n. 5, 77 S.Ct. 872. In a later decision, the Court held that the proper remedy for the Clayton Act violation was complete divestiture by du Pont of its General Motors stock. United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed. 2d 318 (1961).

The present civil action for treble damages was brought pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, alleging that du Pont had violated section 7 of the Clayton Act and sections 1 and 2 of the Sherman Act, and had breached its common law fiduciary duty. Specifically, plaintiffs claimed that subsequent to May 4, 1950,[2] du Pont utilized its stock control to insure its position as primary supplier to General Motors of a variety of products, thereby preventing actual and potential competition from other suppliers and enabling du Pont to

---

1. An amended consolidated complaint was filed in November 1959.

sell General Motors its products at excessive prices. In September 1963, Judge Metzner issued an opinion dealing with the effect to be given to the Supreme Court judgment in the first *du Pont* case, explaining that a decision on that issue in advance of trial was necessary in order to define the scope of deposition-discovery procedures. 221 F. Supp. 488. The judge held that a violation of section 7 of the Clayton Act did not constitute a cause of action for money damages. Moreover, since the Supreme Court judgment dealt only with the situation of the two corporations as of June 1949, the judgment was not available to the plaintiffs, who were suing for acts committed after May 4, 1950, on their other claims, except "for historical purposes and background material." The judge disagreed with plaintiffs' contention that the Supreme Court had found an actual restraint of trade by du Pont, stating that the Court had found only a "reasonable probability of the creation of a monopoly." In a subsequent Pretrial Order dated November 12, 1963, Judge Metzner held that the only "ultimate facts" determined by the *du Pont* decision which might be prima facie evidence in the case at bar were:

(a) that du Pont acquired 23% of the stock of General Motors;

(b) that automotive finishes and fabrics constitute a substantial "relevant market" within the meaning of the Clayton Act;

(c) that said acquisition of stock by du Pont was not solely for investment;

(d) that General Motors' share of the "relevant market" for automotive finishes and fabrics was substantial;

(e) that du Pont supplied a substantial share of that market;

(f) that du Pont used its stock interest in General Motors to entrench itself as the primary supplier to General Motors of automotive finishes and fabrics and that du Pont controlled General Motors to that extent.

The judge dismissed plaintiffs' claim for money damages under section 7 of the Clayton Act as a matter of law, but certified the order for immediate appeal. This court denied leave to appeal from that order on January 31, 1964, and the Supreme Court denied certiorari, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964).

After extensive pre-trial and discovery proceedings, the claims relating to du Pont's sales of automotive fabrics and finishes for passenger cars manufactured by General Motors came to trial in November 1966 solely on the questions of liability of du Pont and injury to General Motors as distinguished from the quantum of damages. The trial continued until late January 1967; thereafter Judge Metzner filed his opinion, dismissing these causes of action. He found that du Pont had not used its stock ownership to control General Motors' purchases of automotive finishes or fabrics or to insulate General Motors from competition in either line of commerce in violation of section 1 or 2 of the Sherman Act and that du Pont had not abused any fiduciary duty to General Motors. On March 29, 1968, final judgment was entered after a finding pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that more than one claim for relief had been presented and that there was no just reason for delay. This finding was upheld by this court in denying defendants' motion to dismiss plaintiffs' appeal in July 1968. 401 F.2d 510.

On this appeal plaintiffs argue that numerous issues of law and fact were incorrectly decided by the court below. We do not have to reach most of these claims, however, for we find that the rulings in Judge Metzner's Pretrial Opinion of September 18, 1963, and their application to the case at trial, were sufficiently erroneous to require remanding the action for further consideration. In particular, we hold that Judge Metzner erred in deciding that a violation of sec-

---

2. This was apparently the earliest date at which any plaintiff owned General Motors stock.

tion 7 of the Clayton Act cannot support a private cause of action for money damages, and that he improperly restricted the scope and weight of the government judgment in the first *du Pont* case as applied to the case at bar. Because of this disposition of the case, we need summarize only briefly the relevant facts set out at length in the *du Pont* opinion and in the opinion of the district court.

During the second decade of the century, du Pont acquired a number of manufacturing operations in automotive fabrics and paints. Considering other areas of further expansion, the corporation became interested in purchasing General Motors stock, both as a profitable investment and because General Motors constituted a large potential market for du Pont products. In 1917, du Pont decided to acquire $25,000,000 worth, or 23 per cent, of the outstanding common stock of General Motors. While the precise percentage of ownership varied for a number of years, it remained at 23 per cent from 1939 on. At least in the first few years after du Pont's stock acquisition, the company made substantial and successful efforts to insure that the maximum share of General Motors' purchases of automotive fabrics and finishes were from du Pont. As the Supreme Court found in the first *du Pont* case, these purchases constituted a substantial part of the total market. Thus, in 1946 and 1947, when General Motors purchased approximately one half of all such products, du Pont supplied 67 and 68 per cent, respectively, of General Motors' requirements for finishes and 52.3 and 38.5 per cent of its fabric requirements. 353 U.S. at 596, 77 S.Ct. 872. During the years covered by the case at bar, the district court found that General Motors' share of the automobile market varied 41 per cent and 52.7 per cent and that du Pont's share of General Motors' purchases averaged at 21 per cent for automotive fabrics and 74 per cent for automotive finishes. 279 F.Supp. at 369. From 1951 to 1959, du Pont sold from 89.2 per cent to 96.2 per cent of its total production of automotive finishes to General Motors and during 1955 to 1959 du Pont's sales of automotive fabrics to General Motors averaged 86 per cent of du Pont's production. *Id.* at 380–381.

In holding that du Pont's stock purchase resulted in a violation of section 7 of the Clayton Act, the Supreme Court found that "immediately after the acquisition, du Pont's influence growing out of it was brought to bear within General Motors to achieve primacy for du Pont as General Motors' supplier of automotive fabrics and finishes," 353 U.S. at 602, 77 S.Ct. at 882, and that "[t]he inference is overwhelming that du Pont's commanding position was promoted by its stock interest and was not gained solely on competitive merit." *Id.* at 605, 77 S.Ct. at 883. The Court referred to "the fact, plainly revealed by the record, that du Pont purposely employed its stock to pry open the General Motors' market to entrench itself as the primary supplier of General Motors' requirements for automotive finishes and fabrics." *Id.* at 606, 77 S.Ct. at 884. This answered the question, posed by the Court at the outset of its opinion, "whether du Pont's commanding position * * * was achieved * * * because its acquisition of the General Motors' stock, and the consequent close intercompany relationship, led to the insulation of most of the General Motors' market from free competition, with the resultant likelihood, at the time of suit, of the creation of a monopoly of a line of commerce." *Id.* at 588–589, 77 S.Ct. at 875. The Court did not determine whether there was an actual restraint of competition at the time, but noted:

The conclusion upon this record is inescapable that such likelihood was proved as to this acquisition. The fire that was kindled in 1917 continues to smolder. It burned briskly to forge the ties that bind the General Motors market to du Pont, and if it has quieted down, it remains hot, and, from

past performance, is likely at any time to blaze and make the fusion complete. *Id.* at 607, 77 S.Ct. at 884.

## II. *Treble damages under section 7 of the Clayton Act.*

Section 4 of the Clayton Act, 15 U.S.C. § 15, states:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained * * *.

The Supreme Court's first *du Pont* decision established that du Pont's acquisition of General Motors' stock was a type forbidden under section 7. In his 1963 pre-trial opinion, however, 221 F. Supp. at 493, Judge Metzner noted that:

> No case has been found discussing the question whether damages can be recovered for a violation of section 7 of the Clayton Act, and no case has been found where damages have been awarded for such a violation.

After distinguishing two cases he concluded:

> The test of a section 7 violation is whether "there is a reasonable probability that the acquisition is likely to result in the condemned restraints." United States v. E. I. du Pont de Nemours & Co., supra, 353 U.S. at 607, 77 S.Ct. [872] at 884, 1 L.Ed.2d 1057. Plaintiffs cannot be damaged by a *potential* restraint of trade or monopolization. There can be no claim for money damages for a violation of section 7.

Other district courts have subsequently reached the same conclusion, see, e. g., Highland Supply Corp. v. Reynolds Metals Co., 245 F.Supp. 510 (E.D.Mo. 1965); Bailey's Bakery Ltd. v. Continental Baking Co., 235 F.Supp. 705, 716–717 (D. Hawaii 1964), and one circuit court has approved it in dictum, see Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725, 728 n. 3 (8th Cir. 1964). However, other courts have disagreed. Both the Fifth Circuit, see Dailey v. Quality School Plan, Inc., 380 F.2d 484, 488 (5th Cir. 1967), and Judge McLean in the Southern District of New York, see Julius M. Ames Co. v. Bostitch, Inc., 240 F.Supp. 521, 523–526 (S.D.N.Y. 1965), have held that there can be a claim for money damages for a violation of section 7, though the latter case contains some qualifying language. Moreover, a number of other cases have impliedly sanctioned such a cause of action, dismissing or affirming the dismissal of section 7 money damage claims only for the lack of a sufficient showing of specific, proximate injury. See, e. g., Blaski v. Inland Steel Co., 271 F.2d 853 (7th Cir. 1959); Bender v. Hearst Corp., 263 F.2d 360, 370 (2d Cir. 1959); Rayco Manufacturing Co. v. Dunn, 234 F.Supp. 593, 597 (N.D.Ill.1964). In Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965), the Supreme Court itself held that the statute of limitations did not bar a private, treble-damage action based on alleged violations of both section 7 of the Clayton Act and sections 1 and 2 of the Sherman Act; although the issue was not discussed, the Court evinced no qualms about dealing with a section 7 money damage claim. Finally, commentators have overwhelmingly supported the conclusion that section 7 does give rise to a. treble-damage action. See, e. g., J. Scott & E. Rockefeller, Antitrust and Trade Regulation Today: 1967, at 340–42 (1967); Stein, Section 7 of the Clayton Act as a Basis for the Treble-Damage Action: When May the Private Litigant Bring His Suit?, 56 Calif.L. Rev. 968, 971–80 (1968); Note, Private Actions Under Sections 4 and 7 of the Clayton Act: A Fresh Look at an Old Problem, 29 *Ohio St.L.J.* 756 (1968); 64 Colum.L.Rev. 597 (1964); 79 Harv. L.Rev. 445 (1965).

■ We agree with those authorities cited above that indicate that a violation of section 7 of the Clayton Act does furnish a basis for a claim for money dam-

ages under the broad language of section 4 of the Act. To begin with, section 1 of the Act, 15 U.S.C. § 12, defines "antitrust laws" as including "this Act," and it seems clear to us that section 7 of the Clayton Act is an antitrust law within the meaning of section 4 of the same Act. This proposition is not the truly disputed one in the above-cited cases or even in this one. The trial judge did not hold that section 7 is not an antitrust law, nor do defendants so contend. The basis of the pre-trial ruling was that a section 7 violation can cause no damage because it establishes only that harm was threatened, not that it occurred. But if the threat ripens into reality we do not see why there can never be a private cause of action for damages. If section 7 is designed to prevent acquisitions that "may" or "tend to" cause specified harm, such an acquisition may either itself directly bring about the harm or make possible acts that do. We do not say that a section 7 violation must, or even probably will, have that result; but that it may and that plaintiffs should have a chance to prove injury "by reason of" the violation are persuasive propositions. The Supreme Court seems to have recognized as much in the first *du Pont* decision, 353 U.S. at 597, 77 S.Ct. at 879, when it rejected the argument that section 7 is applicable only to acquisition of stock and not to the holding or subsequent use of it:

> Its [the Clayton Act's] aim was primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil, which may be at or any time after the acquisition, depending upon the circumstances of the particular case.

Damages have been allowed to private litigants under sections 2 and 3 of the Clayton Act, 15 U.S.C. §§ 13, 14, which are also aimed at anticipated injury and proscribe certain activities when "the effect * * * may be * * * to lessen competition or tend to create a monopoly." See Stein, *supra*, 56 Calif. L.Rev. at 979 & nn. 47–50. Finally, if we had any real doubts on this issue, we would resolve them in favor of a broad, rather than a narrow, construction of section 4, because "Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318, 85 S.Ct. 1473, 1477, 14 L.Ed.2d 405 (1965).

Of course, plaintiffs cannot rest on a showing of a violation of section 7; they must, as in private actions under other sections of the antitrust laws, prove that they have been injured by the violation. However, the Supreme Court's finding that du Pont's stock ownership in General Motors constituted a "potential" restraint of trade or monopolization hardly precludes a showing that a given party was in fact injured by the prohibited acquisition, or that the section 7 violation proximately caused damage which might not in itself constitute a cause of action under the Sherman Act. *Cf.* the examples given in J. Scott & E. Rockefeller, Antitrust and Trade Regulation Today: 1967, at 342 (1967). Appellees argue that even assuming that a cause of action for damages lies under section 7, appellants suffered no prejudice from the district court's ruling as they specifically failed to prove any injury at trial. However, in view of the fundamental nature of the error here, we think that the district court should be given the opportunity to reconsider the evidence before it in the light of our holding that injury from a section 7 violation, as distinct from the alleged Sherman Act claims, is ground for treble damages. The advisability of such a re-examination is further supported by the evidentiary effect which the Supreme Court's finding of a section 7 violation may have on the plaintiffs' claims, a subject discussed below.

### III. *Effect of the first du Pont judgment.*

In his September 18, 1963 opinion, Judge Metzner ruled that since the judg-

ment in the first Supreme Court *du Pont* case covered a different time period than the case at bar, the "ultimate facts" determined in that judgment could not be used against the defendants under section 5(a) of the Clayton Act, 15 U.S.C. § 16(a):

> A final judgment or decree * * hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws * * as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto.

He concluded that "plaintiffs may introduce in evidence the decree in the government suit, for historical purposes and background material * * *. Plaintiffs, however, will have to submit other proof of the existence of the facts on which they base their claims." 221 F. Supp. 488, 494. In his pre-trial order of November 12, 1963, the judge listed the "ultimate facts" inherent in the Supreme Court decision, see page 958 *supra*, which were "prima facie evidence of ultimate facts in this suit," but again limited their availability to plaintiffs:

> The final judgment entered March 1, 1962 in said Government suit may be introduced in evidence on the trial of this action for historical purposes and as background material. The judgment in the said Government suit speaks as of June 30, 1949. The present plaintiffs may only recover damages for acts occurring after May 4, 1950.

In his final opinion in December 1967, 279 F.Supp. 361, 364, the judge noted that a violation of section 7 of the Clayton Act requires no showing "that restraint or monopoly was intended, nor that actual anticompetitive effects flowed from the acquisition." Since "[t]here was no finding of private injury either to the competitors of du Pont

or to General Motors itself" in the *du Pont* decision, the judge came to the "conclusion that the Court's language about entrenchment is not entitled to great weight as prima facie evidence in this case." Again the court noted: "The time period encompassed in the Government suit has been deemed relevant in this trial, however, to place the facts in dispute here in historical perspective."

Although Judge Metzner seemed to imply that "the Court's language about entrenchment" was entitled to *some* evidentiary weight, and one of the "ultimate facts" found in its November 1963 order was that "du Pont used its stock interest in General Motors to entrench itself as the primary supplier to General Motors," we interpret the net effect of the above comments to be that the judgment in the government case was given little or no substantive legal effect on the issues at trial. Since we think that that judgment was entitled to substantially greater impact than a limited use as "historical perspective" or "background material," we find it necessary to remand the case for Judge Metzner's further consideration in light of the principles we will set forth hereinafter.

Considerable controversy has arisen under section 5(a) of the Clayton Act over the proper evidentiary use to be made of government antitrust judgments covering violations prior in time to those alleged as a basis for damages in a subsequent treble-damage action. See generally Shores, Treble Damage Antitrust Suits: Admissibility of Prior Judgments Under Section 5 of the Clayton Act, 54 Iowa L.Rev. 434, 446–49 (1968); Timberlake, The Use of Government Judgments or Decrees in Subsequent Treble Damage Actions Under the Antitrust Laws, 36 N.Y.U.L.Rev. 991, 998–1002 (1961). Thus, some decisions have taken the strict view that a government judgment may not be introduced as evidence at all unless it covers the same, or part of the same, period as that in question in the private action. See International Shoe Machine Corp. v. United

Shoe Machinery Corp., 315 F.2d 449 (1st Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963); Orbo Theatre Corp. v. Loew's Inc., 156 F.Supp. 770, 777 (D.D.C.1957), aff'd per curiam, 104 U.S.App.D.C. 262, 261 F.2d 380 (D.C. Cir. 1958), cert. denied, 359 U.S. 943, 79 S.Ct. 725, 3 L.Ed.2d 677 (1959); cf. Webster Rosewood Corp. v. Schine Chain Theatres, Inc., 263 F.2d 533 (2d Cir.), cert. denied, 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959). Other cases, however, appear to embody a more flexible approach to the question, evaluating the actual relevancy or materiality of the government judgment to the facts and issues in the private suit, even though the period covered by each may differ. See, e. g., Park Neponset Corp. v. Smith, 258 F.2d 452 (1st Cir. 1958); Eagle Lion Studios, Inc. v. Loew's, Inc., 248 F.2d 438, 442–445 (2d Cir. 1957), aff'd by an equally divided Court, 358 U.S. 100, 79 S.Ct. 218, 3 L.Ed.2d 147 (1958); Alamo Theatre Co. v. Loew's Inc., 143 F.Supp. 419 (N.D.Ill.1956); Buckhead Theatre Co. v. Atlanta Enterprises, Inc., 327 F.2d 365 (5th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 158, 13 L.Ed.2d 92 (1964). While it is true that in none of these latter cases was the earlier government judgment allowed into evidence,[3] it is equally true that no flat, inflexible rule of exclusion was applied. The rationale which emerges from them is that while a judgment of violation in a government suit covering a given period is insufficient to establish a violation at a later date, that judgment may be of evidentiary weight in the private action if it encompasses findings sufficiently related to the issues of the private action and if sufficient additional evidence is adduced to show that the illegal activities condemned in the government decree carried over into the period in issue. This approach, which negates an "all or nothing" position, see

Buckhead Theatre Co. v. Atlanta Enterprises, Inc., supra, 327 F.2d at 370 (concurring opinion), perhaps finds some support in Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). In that case, the Supreme Court affirmed a jury verdict for defendants in a treble-damage action under the Sherman Act. The trial judge had allowed the introduction of the decrees in a prior government suit against the defendants, although that judgment was an injunction in 1948, at the latest, of a conspiracy found to exist in 1945, and the private plaintiff claimed damages from a conspiracy in 1949 and 1950. The jury was instructed that these decrees were not sufficient to support recovery in themselves and that the plaintiff had to produce additional evidence relating that conspiracy to the period and location of the alleged conspiracy in issue. Appellant contended that greater weight should have been given to the government judgment; appellees argued that it should have been given no weight at all. The Court rejected appellant's argument, noting that "the relevancy of [the government suit] to the instant case is slight." 346 U.S. at 544, 74 S.Ct. at 261. It declined to pass on appellees' contention. While Theatre Enterprises circumvented the question here in issue, the Court's reference to the "relevancy" of the government judgment to the private action suggests that it may have been "deliberately avoiding an inflexible rule." Shores, supra, 54 Iowa L.Rev. at 447.

█ Certainly there are circumstances here suggesting that it is both appropriate and desirable to give substantial evidentiary weight to the judgment entered in du Pont I. The case is being tried to a judge rather than to a jury, thus minimizing the nagging problem of undue prejudice referred to in many of

---

3. In the Alamo Theatre case, the court deferred determination of the question of admissibility until trial, noting that the "mere fact of plaintiff's entry into the motion picture field subsequent to a con-

spiracy found to exist in 1945 is not alone sufficient for the court to rule as a matter of law that the Paramount decree has no relevance to the instant suit." 143 F. Supp. at 420–421.

the cases. See, e. g., Buckhead Theatre Co. v. Atlanta Enterprises, Inc., 327 F.2d 365, 368 (5th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 158, 13 L.Ed.2d 92 (1964); International Shoe Machine Corp. v. United Shoe Machinery Corp., 315 F.2d 449, 459 (1st Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963). The defendants in the two actions are identical and the same product lines and geographical market are involved. Very similar issues of fact and law are raised in the two cases; important substantive elements of plaintiffs' cause of action under section 7 of the Clayton Act are precisely the same as those determined against defendants by the government *du Pont* judgment. Moreover, while it is true that the complaint which led to the first *du Pont* decision was filed in the district court in June 1949, it would be formalistic in the extreme to ignore the fact that the position of stock ownership which was the crux of the violation existed on June 3, 1957, when the Court in *du Pont I* reversed the district court and ordered it to grant "appropriate" equitable relief and continued to exist until after the Court decreed complete divestiture by du Pont in 1961. Nor does it seem improper to give realistic recognition to the Court's language in both *du Pont* decisions for an understanding of what the government case actually decided. Thus, in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 485, 88 S.Ct. 2224, 2227, 20 L.Ed. 2d 1231 (1968), the Court made clear that:

> We are not, however, limited to the decree in determining the extent of estoppel resulting from the judgment in the Government's case. If by reference to the findings, opinion, and decree it is determined that an issue was actually adjudicated in an antitrust suit brought by the Government, the private plaintiff can treat the outcome of the Government's case as prima facie evidence on that issue.

Moreover, the Court specifically noted that it would be proper in determining the effect of the judgment in a government case to look to earlier opinions both "with respect to violation and \* \* with respect to remedy." *Id.* It is significant, therefore, that in its second *du Pont* decision, 366 U.S. 316, 318–319, 81 S.Ct. 1243, 1246 (1961), the Court apparently regarded its 1957 holding as encompassing not only an antitrust violation but also injury, summarizing its prior decision:

> We held that du Pont's acquisition of the 23 percent of General Motors stock *had led to the insulation from free competition* of most of the General Motors market in automobile finishes and fabrics \* \* \*. [Emphasis added.]

We do not agree entirely with the lower court's statement that "[t]he thrust of the [first *du Pont*] opinion was directed to show the probability of public injury based on events quite far removed from the time period with which we are concerned herein." 279 F.Supp. at 364. The Court in that decision did not focus exclusively on evidence relating to the early years of the du Pont stock acquisition but relied as well on such recent factors as the growing substantiality of the relevant market up to 1955, 353 U.S. at 595 n. 16, 77 S.Ct. 872, and on the fact that Fisher Body, a division of General Motors which had long stubbornly resisted du Pont sales pressure, only gave in at last to that pressure in 1947 and 1948. *Id.* at 604–605, 77 S.Ct. 872. The Court also noted that "[t]he potency of the influence of du Pont's 23% stock interest is greater *today,*" *id.* at 607 n. 36, 77 S.Ct. at 884 (emphasis added), because of the diffusion among a larger number of stockholders of the non-du Pont owned shares. In short, the language of the Court is directed to a real present danger of impairment of competition. In its 1961 decision, the Court clearly indicated that this danger continued to be present, holding that even the partial divestiture plan proposed by the district court would not insure the elimination of "the tendency towards monopoly of the acquisi-

tion condemned by § 7." 366 U.S. at 331–332, 81 S.Ct. at 1253.

It is important to distinguish this case from the more usual situation in which plaintiffs seek to apply to a subsequent period a government judgment condemning activities prohibited under the antitrust laws, where it is not unreasonable to assume that defendants ceased those activities after the prohibition. Here the very acquisition and position of potential control which was found violative of the Clayton Act as of 1949 continued through 1961. We need not dispute the statement of the district court that, in the ordinary antitrust case, there is no "presumption of continuance of unlawful conduct," 221 F.Supp. 488, 493 (1963). Here, however, what was unlawful was du Pont's status as stockholder in General Motors, and that status continued until divestiture.

Accordingly, while we make no attempt to formulate a general rule on the effect to be given to government judgments relating to earlier time periods, we hold that under the circumstances of this particular litigation, the judgment in the Government's suit was entitled to greater evidentiary weight than was accorded it by the court below. We are aware that the judgment is only prima facie evidence at best and that plaintiffs have the burden of showing not only antitrust law violation but injury as well. However, it must be remembered that if the latter fact is established to the satisfaction of the trier, "the standard of proof as to the quantum of damages is less severe," as appellee du Pont concedes.[4] See, e. g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–266, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Flintkote Co. v. Lysfjord, 246 F.2d 368, 392 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). In any event, as to

all the issues, the trier of fact must make the determination, giving proper weight to the earlier judgment, and the district court may allow further evidence, although it is not required to. While we do not know whether it will reach the same conclusions as before on the record before it, plaintiffs are entitled to a determination which gives greater consideration to the earlier rulings of the Supreme Court.

Accordingly, we remand for further proceedings consistent with this opinion. In view of this disposition of the appeal, we find it unnecessary to rule or express any views on appellants' additional arguments that the trial judge erroneously held that du Pont had not violated the Sherman Act[5] or breached any fiduciary duty to General Motors.

---

4. Brief for Appellee du Pont at 37 n. 36.

5. Appellants do not press on appeal the lower court's finding as to § 1 of the Sherman Act but have relied primarily on an alleged violation of § 2.