**WEIMAN CO., Inc., Plaintiff-Appellant,**

v.

**KROEHLER MFG. CO., Defendant-Appellee.**

**No. 17876.**

United States Court of Appeals, Seventh Circuit.

June 23, 1970.

---

Edward L. Foote, Winston, Strawn, Smith & Patterson, Chicago, Ill. of counsel, for appellant.

Leo H. Arnstein, Stanley M. Lipnick, Burton Y. Weitzenfeld, Chicago, Ill., Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., of counsel, for appellee.

Before KILEY, CUMMINGS and KERNER, Circuit Judges.

CUMMINGS, Circuit Judge.

This treble damage antitrust action was brought by Weiman Company, Inc., a small wood furniture manufacturer with its principal place of business in Chicago, against Kroehler Mfg. Co., a Naperville, Illinois, furniture manufacturer. The three-count complaint was brought under Section 4 of the Clayton Act (15 U.S.C. § 15) and charges defendant with violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and Section 7 of the Clayton Act (15 U.S.C. § 18). The gravamen of these claims was that Kroehler, allegedly the largest upholstered furniture manufacturing company in the world, had purchased two essential manufacturing suppliers of Weiman. These "predatory" acts allegedly damaged Weiman to the extent of $2,200,000 before trebling. The district court entered summary judgment for defendant on the view that, as a matter of law, plaintiff did not show that the alleged antitrust violations proximately caused plaintiff's injury.

According to the complaint, commencing in 1963, Weiman obtained its entire production of Sun Glow furniture from the Lexington Chair Company Division of Thomason Industries in Lexington, North Carolina. Under an October 15, 1963, agreement between those parties, Weiman agreed to purchase all of Lexington's production for fifteen years. Thomason agreed not to sell the plant at Lexington, North Carolina, without giving Weiman "the first refusal of purchase." If Weiman did not exercise its option to purchase, the supply contract

would be terminated except for the completion of the then current orders.

In 1958, Weiman entered into a similar agreement (supplemented from time to time) with the Colonial Manufacturing Company of Thomasville, North Carolina, for the manufacture of Weiman's medium-priced occasional tables. According to the complaint, it was agreed that the Thomasville plant could not be sold "without tendering the fair purchase price" to Weiman.

In March 1966, Kroehler contracted to purchase the Lexington and Colonial plants. Pursuant to a March 22, 1966, agreement between Weiman, Thomason Industries, Inc., and a Kroehler subsidiary, Weiman waived its option to purchase the Lexington plant, and Thomason and Weiman agreed to terminate the October 1963 agreement between them. In addition, Weiman agreed to purchase certain products to be manufactured by the Kroehler subsidiary at Lexington, North Carolina, through March 31, 1967.

Also on March 22, 1966, Weiman, Colonial and the same Kroehler subsidiary entered into an agreement terminating the arrangements between Weiman and Colonial and providing for the Kroehler subsidiary to manufacture occasional tables for Weiman at Thomasville, North Carolina, until the end of March 1967.

On September 19, 1967, the Kroehler subsidiary sued Weiman in a federal court in North Carolina for $572,575.35, asserting that Weiman had breached both March 22, 1966, contracts. Ten days later, this suit was settled by Weiman for $160,000. Kroehler contends that under the settlement, Weiman released all claims or demands it could have asserted against Kroehler in that suit. Affidavits of Weiman's president and its North Carolina counsel assert that the settlement was to avoid having its Ramseur, North Carolina, plant attached.

Weiman charges that defendant's purchase of the Lexington and Colonial plants comprised a step in defendant's monopolistic expansion and was motivated by the predatory aim of excluding plaintiff from its necessary supply of furniture. In reply, Kroehler disputes the allegations that its behavior "caused" the damage suffered by Weiman. Defendant urges that Weiman actually suffered its losses as a result of its own voluntary withdrawal from the requirements contracts it had with the two facilities. In support of this argument, defendant points out that Weiman terminated its requirement rights under the contracts and refused to exercise its right of first refusal of purchasing the plants. In the first of the March 22, 1966, contracts, one of the recitals stated that Weiman was constructing a plant at Nichols, South Carolina, to be completed about January 1, 1967, "thereby eliminating any need for further production of products for Weiman by Thomason [at Lexington, N. C.] after March 3, 1967." Similarly, the other March 22, 1966, contract recited that Weiman was constructing an addition to its Ramseur, North Carolina, plant to be completed in July 1966, so that Weiman would need a Thomasville, North Carolina, source for occasional tables only "until its facilities in Ramseur is [sic] in production."

The district court accepted Kroehler's position that the requisite relationship between the alleged antitrust violations by defendant and damage to plaintiff was absent because any damage to Weiman resulted from its own voluntary acts in joining in the two March 22, 1966, contracts. The court considered the question to be whether the March 22 contracts were voluntarily entered into or were the product of economic coercion and duress, as contended by plaintiff. The district judge noted that the contracts were executed only after "long and apparently difficult discussions" between the parties. He further pointed to the fact that plaintiff could have filed a treble damage suit instead of executing the contracts, and was in any case tardy in disavowing the contracts. Relying upon these three factors, he ruled that as a matter of law, the contracts were voluntary and that plain-

tiff's case lacked the essential element of proximate cause. We disagree and reverse.

■ The only question at issue on this appeal is whether as a matter of law, the contractual arrangements between Weiman and its suppliers were altered as a consequence of anti-competitive practices of defendant Kroehler or, as found by the district court, because of Weiman's independent and voluntary judgment that its commercial and competitive position would thereby be enhanced. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696–702, 82 S.Ct. 1404, 8 L.Ed.2d 777; Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 note 9, 89 S.Ct. 1562, 23 L.Ed.2d 129; cf. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982. In order to establish damages, it is necessary for Weiman to show only that defendant's illegal conduct "materially contributed" to plaintiff's injury, notwithstanding the existence of other significant causative factors. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 702, 82 S.Ct. 1404; see also Haverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798, 805–806 (1st Cir. 1964), certiorari denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343. Resolution of this causal question at this early stage in the proceedings is rendered all the more difficult by the absence of any concrete factual assessment of the defendant's own conduct or its impact upon the industry and plaintiff. Nevertheless, it is evident that summary judgment should not have been granted against plaintiff since Weiman has raised, by its pleadings and affidavits, a genuine question of material fact as to the source of its damages. Poller v. Columbia Broadcasting Co., 368 U.S. 464, 467, 473–474, 82 S.Ct. 486, 7 L.Ed.2d 458.

■ Weiman's pleadings, which we must presently assume to be correct, indicate massive anti-competitive practices directed to Kroehler's vertical expansion and the attendant elimination of competing furniture manufacturers. These pleadings indicate the heavy commitment of plaintiff's resources to the supply arrangements which it made with Thomason and Colonial. According to Weiman, pursuant to expansionist policies, Kroehler offered to purchase the plants from which plaintiff was receiving its products at a time when plaintiff was unable to match the amount offered for those plants.

Plaintiff contends that the substitution of contracts which took place in 1966 merely represented the effectuation of defendant's plan for "phasing" plaintiff out of the furniture business. Plaintiff points out that the agreements executed in 1966 upon which the district court relied replaced advantageous commercial relationships upon which Weiman had staked its future for barely adequate temporary supply agreements with Kroehler's own subsidiary. Plaintiff persuasively argues that the disparities in its competitive posture before and after those transactions militate against a voluntary cancellation of its relations with the independent companies. Moreover, under its original contract with Thomason, sale of the Lexington facilities automatically terminated Weiman's supply contract.

While those elements alone cast substantial doubt upon the appropriateness of the summary judgment for defendant, direct evidence was presented by plaintiff through affidavits of its president and treasurer. This evidence indicated that the recitals of the contracts as to the Lexington, North Carolina, plant were false because Weiman had no plans to produce its Sun Glow line "in any other plant and no such plant was under construction." The affidavits also contradicted the contractual averment that Weiman had served notice to terminate its arrangement with the Lexington facility. These officers charged

that upon pointing these facts out to Kroehler, they were advised by defendant that the contract had to be in the proposed form for antitrust reasons and that production at Lexington would be supplied to Weiman only if the agreement were executed in the proposed form.[1] Finally, not one item of evidence was marshalled by defendant to provide an alternative explanation.

The factors relied upon by the court below fail to justify the summary judgment. The duration of the negotiations is not at all clear and does not shed any light on the motivation of the parties to the March 22, 1966, agreements. Equally uninformative is the fact that Weiman need not have submitted to the imposed terms but could have instituted an action for treble damages at that time. Cf. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139–140, 88 S.Ct. 1981, 20 L.Ed.2d 982; Simpson v. Union Oil Co., 377 U.S. 13, 16–17, 84 S.Ct. 1051, 12 L.Ed.2d 98. The exigencies of business, as well as the realities of complicated and extended litigation, might well negate the efficacy of such an alternative. Similarly, the two-year delay in objecting to the terms of the two contracts may in fact be amenable to a reasonable explanation.[2]

There is no need to elaborate at this time on the particular ramifications which may arise upon remand. We merely hold that in light of the abundance of contradictory evidence, summary judgment on the issue of the causation of plaintiff's damages should not have been granted in favor of defendant.

The judgment of the district court is reversed and the cause is remanded for further proceedings.

---

1. The affidavits do not refer to the other March 22, 1966, contract, but Weiman urges that it was only executed in order to obtain needed production at Thomasville, North Carolina. The district court treated both contracts the same way, and for purposes of the appeal we will do likewise.

---

2. For example, plaintiff apparently contends that it did not assert any antitrust defenses to Kroehler's 1967 suit for breach of the two contracts in order to avoid seizure of plaintiff's Ramseur, North Carolina, plant.