PUREX CORPORATION, LTD., a
corporation, Plaintiff,

v.

The PROCTER & GAMBLE COMPANY,
a corporation, and the Clorox Company,
a corporation, Defendants.

Civ. No. 67–1546–WPG.

United States District Court,
C. D. California.

July 23, 1976.

Gibson, Dunn & Crutcher, Julian O. von Kalinowski, John L. Endicott, John J. Swenson, Los Angeles, Cal., for plaintiff.

Covington & Burling, Daniel M. Gribbon, Harris Weinstein, Washington, D. C., Dinsmore, Shohl, Coates & Deupree, Powell McHenry, Cincinnati, Ohio, McCutchen, Black, Verleger & Shea, Philip K. Verleger,

Robert K. Wrede, Kathryn S. Rowley, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION

GRAY, District Judge.

The present action is for treble damages of more than five hundred million dollars, sought pursuant to section 4 of the Clayton Act (15 U.S.C. § 15) and arising out of the acquisition (in August 1957) and retention (until January 1969) by defendant Procter & Gamble (Procter) of the Clorox Chemical Company, the alleged effect of which has been "substantially to lessen competition . . . [and] to tend to create a monopoly," in violation of section 7 of the Clayton Act (15 U.S.C. § 18). The complaint also charges Procter and defendant Clorox Company (Procter's wholly owned subsidiary to whom the assets of the acquired company were transferred) with conspiracy to restrain trade and to obtain a monopoly in interstate commerce in violation of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

This matter has been fully briefed and tried to the court without a jury, and the court has received and studied the post-trial memoranda submitted by the parties. For reasons hereinafter set forth, judgment will be for the defendants.

Procter is a large and nationally well known manufacturer of soaps, detergents and other high-turnover household products sold principally through grocery stores. On August 1, 1957, Procter acquired the assets of the Clorox Chemical Company, which, at that time, was the nation's leading manufacturer of household liquid bleach, having a market share of about 49%, with annual sales of almost $40,000,000. Purex, the present plaintiff, with a market share of 15.7%, was the closest competitor of Clorox for the liquid bleach market.

On September 30, 1957, the Federal Trade Commission instituted proceedings which challenged the above-mentioned acquisition as having been in violation of sec-

tion 7. On November 26, 1963, the Commission ruled that such violation had occurred and ordered that Procter divest itself of Clorox (63 F.T.C. 1465). On April 10, 1967, the Supreme Court affirmed the Commission order (386 U.S. 568), and the divestment was completed on January 2, 1969.

The present action, which was filed on October 23, 1967, is based principally upon the proposition that: (a) the acquisition violated the antitrust laws, as the decision by the Supreme Court finally determined; (b) the plaintiff was damaged as a result of the acquisition; and (c) the plaintiff is entitled to relief under section 4 of the Clayton Act (15 U.S.C. § 15) which provides that "Any person who shall be injured in his business . . . by reason of anything forbidden in the antitrust laws may . . . recover threefold the damages by him sustained . . . ."

The threshold question is whether or not an infringement of section 7 is the type of antitrust violation that justifies a claim for damages under section 4. Procter was adjudged to have violated the antitrust laws in having acquired Clorox because, in the words of section 7, the effect of such acquisition " . . . *may be* substantially to lessen competition, or to *tend* to create a monopoly." (Emphasis supplied.)

Thus, the fact of the section 7 violation, which Procter does not challenge in these proceedings, is no proof whatever that the acquisition *did* lessen competition or *did* tend to create a monopoly or *did* injure the plaintiff in any way. Section 7 speaks only as of the time of the acquisition, and a violation is determined to exist only because of a prediction as to what might happen as a result thereof.

The Ninth Circuit appears not to have passed directly upon the question of whether an acquisition adjudged to be contrary to section 7 constitutes an antitrust violation of a type that would warrant an action for damages under section 4.[1] However, an

---

1. Tacit Ninth Circuit approval of the concept of basing a section 4 damage action upon a sec-

tion 7 violation may be inferred from the opinion resolving an interlocutory appeal in these

affirmative answer is found in a well-reasoned opinion in *Gottesman v. General Motors Corp.*, 414 F.2d 956 (2d Cir. 1969). Judge Feinberg, in speaking for the court, adverted to the fact that an adjudication of a section 7 violation establishes only that the harm of substantially lessened competition and a tendency toward monopoly is threatened, not that it occurred. He then stated:

> "But if the threat ripens into reality we do not see why there can never be a private cause of action for damages. If section 7 is designed to prevent acquisitions that 'may' or 'tend to' cause specified harm, such an acquisition may either itself directly bring about the harm or make possible acts that do. We do not say that a section 7 violation must, or even probably will, have that result; but that it may and that plaintiffs should have a chance to prove injury 'by reason of' the violation are persuasive propositions." 414 F.2d at 961.

A similar analysis and result are contained in *Carlson Companies, Inc. v. Sperry & Hutchinson Co.*, 507 F.2d 959 (8th Cir. 1974).

Following the lead of *Gottesman*, the present case was tried by this court on the basis that the plaintiff "should have a chance to prove injury 'by reason of' the violation . . . ." of the antitrust laws committed by Procter in having acquired Clorox. However, in the opinion of this court, the plaintiff simply was unable to show that it suffered any damage that is chargeable to such acquisition.

■ From the many witnesses and the welter of documentary evidence received in this case, the following conclusions were impelled which, individually and collectively, preclude an award to the plaintiff:

1. Clorox did nothing after the merger that it could not readily have done before the merger.

2. Pre-acquisition Clorox regularly did a better job in marketing liquid bleach than

did Purex, and the same trend continued after the merger.

3. Clorox, under Procter, was not anticompetitive to any actionable extent under the antitrust laws.

4. The comparative inferiority of Purex in marketing liquid bleach stemmed principally from decisions of its own management, rather than having been imposed by Clorox.

5. The claim by Purex that its national expansion plans were frustrated by fear of Clorox, is an after-thought, induced by the contemplation of this litigation.

There follows in this memorandum a discussion of the principal bases for these conclusions.

## I. CLOROX DID NOTHING AFTER THE MERGER THAT IT COULD NOT READILY HAVE DONE BEFORE THE MERGER.

A. *Financial Resources.* In concluding that the retention of Clorox by Procter would be potentially anticompetitive, Commissioner Elman, in speaking for the Federal Trade Commission, expressed the concern that Procter's large financial resources might be used to overwhelm competition by financing expensive sales promotions or "in a price fight to the finish." (63 F.T.C. 1465, 1566–7). Nothing like that happened. Procter did not dip into its "deep pockets" for the benefit of Clorox. Sales promotions were financed strictly out of proceeds from the sales of liquid bleach, just as they had been prior to the merger. With a few localized and temporary exceptions, Clorox never did cut its prices below cost.

In other words, none of the actions of Clorox during the retention period here concerned were dependent upon financial help from Procter. The money flow was entirely the other way, in form of profits going to the parent company.

proceedings (453 F.2d 288 (9th Cir. 1971)). There, the Court of Appeals upheld this court in its determination that the plaintiff was entitled to have the divestment order by the Feder-

al Trade Commission, as affirmed by the Supreme Court, received at the trial of this action as *prima facie* evidence that Procter's acquisition of Clorox violated the antitrust laws.

B. *Independent Operation.* Clorox was administered by its own personnel after acquisition, in much the same manner as before. As soon as Procter gained control, one of its senior executives, Fred Brown, was designated to take charge of Clorox as executive vice president. He moved to Oakland, California, where the headquarters of that company were located, and he brought with him two principal assistants who also had come up through the ranks at Procter. Over the years, Clorox hired several other employees from Procter to fill assignments for which their well-established skills uniquely qualified them. Procter management traditionally has been considered to be very enlightened in the field of manufacturing and marketing household products. Doubtless, Mr. Brown and his associates that came from Procter had acquired valuable expertise in the course of their years with that company, and, as the record shows, they served Clorox very well. However, it could hardly be argued that Procter was the only source from which Clorox could have obtained competent management personnel.

Mr. Howard Morgens, then the chief executive officer of Procter, also held the title of president of Clorox. He testified that the attitude of Procter toward Clorox at the time of the merger was that it had been remarkably successful, having grown as rapidly as Procter; and that it should be permitted to continue to operate as a separate entity in substantially the same manner as before. The record indicates that this attitude generally was adhered to throughout the period of acquisition. Mr. Brown was in frequent contact with Mr. Morgens to keep the latter informed as to what Clorox was doing, and in the course of the years, some advice and direction were given and some restrictions imposed. However, for the most part, local Clorox management was "given its head"; its basic policies remained the same; and, apart from increased expertise in some areas, it was little different after the acquisition than before.

C. *Use Of Procter's Technical Services.* Procter had within its organization separate departments whose sole function was to discover and develop better ways of accomplishing the many aspects of producing and marketing its various products. These departments provided technical services in areas of market research, media studies for advertising, package and label design, product development, engineering assistance and others. As a member of the Procter "family," Clorox was entitled to these services and did use them to some considerable extent. However, Clorox was charged for all of such services. These charges and payments were presumably limited to bookkeeping transactions, but they reduced the "profits" of Clorox in the same manner as did other expenses, a fact that regularly was taken into account in determining whether to use a particular service. Of course, throughout the period of the merger (as well as at all other current times), comparable services were available for hire from sources unrelated to Procter and were used by Purex as well as by Clorox. The services that Procter afforded to Clorox doubtless were very good; how they compared with the services that were available to Purex and otherwise available to Clorox is a matter of conjecture and presumably varied greatly from instance to instance. Whatever differences there may have been can hardly constitute any part of a foundation for a damage claim.

D. *The Clorox Broker Organization.* Another concern expressed by Commissioner Elman as a reason for the divestment order, was the possibility that Procter might use its own direct sales force in the marketing of Clorox liquid bleach, with resulting promotional advantages to that product. (63 F.T.C. 1465, 1565). This anticipation, also, did not materialize. Prior to the merger, Clorox distributed its bleach to retailers by means of a network of independent brokers. The same system was used after the merger and remained under the direct control of the same Clorox official, Bernard Trimpe.

E. *Television Advertising Costs.* Commissioner Elman also felt that the merger of Clorox, a single product firm, with Procter, a very large, multi-product organization, would be likely to give undue enhancement to Clorox's competitive position through substantial cost savings in television advertising. (63 F.T.C. 1465, 1563).

It is true that discount rates available for local "spot" advertising favor the large advertiser. Clorox, as a part of Procter, was accordingly granted larger discounts than would have been available to Clorox alone. However, policies of Procter precluded Clorox from negotiating for additional "off-card" discounts that it might otherwise have obtained. Although these two offsetting circumstances doubtless resulted in a net gain to Clorox, the record does not show its extent. In any event, Clorox had ample funds with which to pay for the advertising that it chose to purchase, irrespective of the discounts, and the matter of such discounts is not shown to have played a substantial part in its advertising policies.

The plaintiff, also, received substantial discounts, and, unlike Clorox after the merger, the plaintiff sought and received special "off-card" discounts. There was no suggestion in the record that the discount rates earned by Clorox had any impact upon the nature or the quantity of the advertising program envisaged, adopted or maintained by the plaintiff.

■ Under the rule suggested in *Gottesman* and followed by this court, in order for the plaintiff to recover damages on the basis of a section 7 violation, it must establish that the acquisition did actually bring about the harm to the plaintiff or make possible acts that caused such harm (see *supra,* page 934). As the foregoing discussion shows, Clorox operated in largely the same manner after the merger as it did before, and the vast resources of Procter were not used to give Clorox capabilities that previously were unavailable to it. Under these circumstances, the necessary causal connection between the acquisition and any harm to the plaintiff is simply lacking.

The record does clearly show that the merger was largely responsible for an increase in Clorox's efficiency, which doubtless was reflected in its profits. This is hardly a basis for criticism in this action, inasmuch as "competition based on efficiency is a positive value that the antitrust laws strive to protect." *Connell Construction Company v. Plumbers and Steamfitters Local Union No. 100,* 421 U.S. 616 at 623, 95 S.Ct. 1830, 44 L.Ed.2d 418 at 426 (1975).

However, even such increased efficiency does not represent a change, insofar as the pre-merger and post-merger relationships between Clorox and Purex are concerned, as we now discuss.

## II. PRE–ACQUISITION CLOROX REGULARLY DID A BETTER JOB IN MARKETING LIQUID BLEACH THAN DID PUREX, AND THE SAME TREND CONTINUED AFTER THE MERGER.

In this litigation, the plaintiff seeks to characterize pre-merger Clorox as a competitor whose passive and benign attitude was "live and let live." The plaintiff then complains that after the merger Clorox suddenly became highly aggressive and fought successfully to increase its share of the liquid bleach market at the expense of Purex. According to the plaintiff, such a change in attitude and practice was one of the results of the merger; and that since the merger was determined to have been in violation of the antitrust laws, the plaintiff is entitled to recover damages equal to all reductions in its profits that can be attributed to the awakening of its adversary.

■ Putting aside for the time being this somewhat startling conclusion, the record simply does not support the premise that the acquisition marked a substantial change in the competitive relationships between the two rivals.

Ever since the end of World War II, Clorox has been more successful in marketing liquid bleach than has the plaintiff. Well before the merger, Purex officials were thoroughly aware of this trend and regularly expressed concern. For example,

a forty-page memorandum, prepared some time in 1956 to aid in planning the Purex 1957 advertising program, begins by reciting that "Purex has increased its liquid bleach sales 10% since 1952 (equal to the population increase), but Clorox has increased 46%, 'all others' 25%. In Purex territories, Clorox is weaker, increasing only 38%—but 'all others' increased 31% against the Purex 10%." On July 6, 1955, a senior Purex official expressed concern about the tendency for Clorox "to be regarded as generic for bleach." (Exhibit 1614, page 3). And a memorandum of a conference attended by several Purex executives on December 15, 1955, states: "Facing the fact that Clorox, with heavy advertising expenditures, continues to steal business from Purex, it was agreed that imagination must be applied to our marketing concept and that Purex must be made to stand out attractively as a more desirable product on the retail shelves." (Exhibit Q, page 2).

The Purex share of the combined Purex-Clorox sales in the regions of the United States where Purex was doing business declined from about 58% in 1946 to about 46% at the time of the acquisition in 1957. Thereafter, the Purex comparative percentage figure kept going down at substantially the same rate until it reached about 33% when the divestiture was completed at the beginning of 1969. (Exhibit 1650, Table 4F). As might be expected, the graphic line of descent was not exactly straight. (Exhibit ATA). On the contrary, it showed occasional short-lived tendencies to level off. One of these brief pauses occurred in 1955 and 1956, about a year before the merger. The plaintiff insists that this shows that Purex finally had solved the problem of competing with Clorox, and that the resumption of the decline in its percent of the combined sales was attributable to the acquisition.

I can find nothing in the record to support the plaintiff's conclusion. The graphic line of descent shows that other temporary plateaus, even upswings, occurred in 1960 and 1966, well after the merger, and it appears that they and the leveling off in 1955–56 were no more than pauses in the downward trend that had marked the plaintiff's record of competition with Clorox ever since World War II.

## III. CLOROX UNDER PROCTER WAS NOT ANTICOMPETITIVE.

The plaintiff complains that after the merger, Clorox engaged in a series of predatory practices directed towards Purex which frustrated the latter's ability adequately to compete. As has been discussed earlier in this opinion (see section I, *supra* ), anything that Clorox did after the merger it had the full capability to do before. Under these circumstances, even if the acts complained of were to be considered anticompetitive, I do not see how they can be charged to the acquisition and made the basis of a damage claim under the antitrust laws. Be that as it may, the showing made by the plaintiff indicates to this court that the acts complained of amounted to no more than the vigorous competition that one would expect among rivals in the marketplace.

A. *Marketing Expenditures.* The plaintiff complains that Clorox developed a special fund from which it spent money for increased advertising and promotion in Purex's strong market areas, particularly Southern California, in order to keep Purex so busy there that it would not be able to compete with Clorox in other areas.

From the outset of the acquisition, Clorox did divide its market areas into three classifications: those where it was strong; those where it was relatively even with the competition, including Purex; and those where it was relatively weak. Clorox thereupon set out to improve its condition in all three categories of market areas. It sought to strike a balance between the principle of "spending your money where your business is," and the equally valid principle of using earnings from strong markets to "beef up" advertising and promotions in the problem areas or "targets of opportunity."

Southern California was an area in which Clorox sought to catch up with Purex, and

it spent more money in advertising and promotions there than it did in other areas. I am not certain whether it siphoned funds from profits earned elsewhere in order to do so, but the record does not show that it made sales below cost in any area as a result of increased advertising expenditures.

■ A definitive Purex memorandum setting forth the plans for its liquid bleach for fiscal year 1963 states:

"Liquid Bleach brand strategy will be:

&ast; &ast; &ast; &ast; &ast; &ast;

"7. Sales promotion dollars should be used in selected opportunity or problem markets. Criteria to determine these markets will include competitive conditions, commodity volume, profit potential, share and/or distribution opportunity, product availability, etc." (Exhibit AJ, page 1).

This would appear to indicate that Purex adopted the very same policy with which it now charges Clorox. In any event, I see nothing wrong in a competitor trying to overcome its "problem markets" by increasing expenditures for advertising, whether the money used is from local profits or imported funds from more profitable areas.

B. *Bleach Boards.* Store proprietors that sell liquid bleach usually display it in the familiar frame-like structures, called "gondolas," that form the interior aisles of the super markets. The gondolas contain adjustable shelves that are spaced according to the height of the merchandise stocked thereon. All liquid bleach normally is displayed in the same gondola, each brand being given at least one frontal position, or "facing," for each size, the numbers of additional facings being dependent upon the judgment of the store management as to how relatively fast-moving the item is. The more facings a brand has, the more likely it is that the "billboard" effect of the successive rows of bottles will catch the eye of the shopper, and the increased number of bottles will lessen the likelihood of the supply becoming fully depleted before the management gets around to replenishing it. Naturally, each distributor of grocery products tries to get as many facings as he can persuade the store manager to accord him.

Shortly after the acquisition, the brokers of Clorox began proposing to the store managers that they allow them to remove the shelves of the liquid bleach gondolas and stack the bottles solidly from bottom to top, giving stability to the pile by using flat plywood boards to divide the top of one layer from the bottom of the next. This manner of displaying the bleach increased substantially the number of bottles that the gondola could hold, thus lessening the likelihood of an "out of stock" condition. It also enhanced the "billboard" effect which made the display more appealingly noticeable to the customers.

These circumstances, plus the willingness of the Clorox brokers to furnish the boards and do the physical work involved in the adjustment, caused many store managers to react favorably to the idea, and "bleach boarding" appeared in many stores.

Of course, it was necessary to cut the boards into sizes that would correspond to the numbers of facings accorded the respective brands, and, inasmuch as the Clorox brokers brought their own saws and did the cutting, it is hardly likely that they would discriminate against their own product in proposing an allocation of facings. It may also be assumed that a store owner, impressed with the initiative and industry displayed and the valuable service rendered by the Clorox representative, would be likely to resolve in his favor a close decision of who gets a particular facing.

The practice of "boarding" came early to the attention of the plaintiff, and its response was equivocal and varied. Some of the Purex representatives were instructed to complain to the store owners about the boarding and to try to get them to discontinue the practice. Other Purex salesmen were told that they could offer to put in boards if they felt that they had to do so, but they were encouraged not to engage in the practice generally. For the most part, Purex did nothing about the matter.

Much of the plaintiff's case at the trial was devoted to complaining about the un-

fairness of bleach boarding and of the harm that such a practice caused to its business. One Purex salesman testified that Clorox, through its broker representatives with their boards and saws, "went through the market like a whirlwind." Another contended that, because of the boarding, Purex was "locked in," as far as being able to get more shelf space for its own promotions was concerned, and that in some instances Clorox obtained and held facings that were not justified by the comparative movement of its bleach. It is thoroughly understandable that Clorox may have gained an occasional facing from Purex because the hand that held the saw belonged to the former. However, the entire matter of whether a store would accept a bleach boarding program and, if so, how the space in the gondola should be divided, was under the control of the retailer. His objective would be to adopt the system that he felt would sell the most bleach and to allocate the space among all brands sold by the store in accordance with the "movement" of the respective items. Bearing such motivation in mind, I have grave doubt that instances of unjust or unreasonable curtailment of Purex facings because of the Clorox boarding program were very widespread. This doubt is given support by a Purex inter-office memorandum dated June 2, 1965, which discussed the results of a "liquid bleach shelf exposure" study, performed by A. C. Nielsen Company, for a year ending in March 1965. The memorandum stated one of its "observations" to be that "Purex shelf facings remained relatively unchanged within each of the Purex regions and very favorable as compared with sales shares." (Exhibit V, page 2).

■ Because the plaintiff has complained so insistently about "boarding" throughout this litigation, I have pondered long and hard in trying to understand how such conduct could be considered predatory. The attempt has been unavailing. It seems to me that the program constitutes an instance of enlightened service to the store owners and to the bleach industry as a whole. Any competitive advantage that Clorox may have gained thereby stems from commendable initiative in an area of fair competition.

C. *Advertising Reference To "Weak Bleaches."* Some time after the merger, Clorox began to advertise the claim that Clorox gets out dirt better than do "weak bleaches." The plaintiff now infers and complains that the asserted comparison was directed against its liquid bleach and cries "foul," inasmuch as the chemical content of all liquid bleaches is substantially the same (or was until Purex introduced its more concentrated 6% bleach).

Clorox responds that its advertisement was directed at dry bleaches, which are demonstrably weaker, and it also justifies its advertising by claiming that because of the relatively rapid shelf turnover that Clorox enjoys, there usually is less time for it to deteriorate before being sold and is therefore likely to reach the housewife at higher strength than do slower moving bleaches.

Clorox also contends that, although it had no intention to imply that Purex was a "weak bleach," the plaintiff may have permitted such an inference to develop in the mind of the housewife by referring to its bleach as "mild" and "gentle."

If all liquid bleaches are chemically the same, the comparative culpability between one manufacturer advertising his product as "strong" and the other touting his as "gentle" is not readily apparent. In any event, the matter of whether such advertising is permissible may be of interest to the Federal Trade Commission, under section 5 of the Federal Trade Commission Act (15 U.S.C. § 45); it is hardly a material, or even relevant, consideration in a multi-million dollar antitrust suit. See, *Holloway v. Bristol-Myers Corporation,* 158 U.S.App.D.C. 207, 485 F.2d 986, 989 (1973).

D. *The Litmus Test.* Despite the substantial chemical similarity among all liquid bleaches, Clorox's product apparently did have a relatively somewhat lower pH, or alkalinity, factor. The defendant discovered that this quality caused Clorox to turn litmus paper white a bit more rapidly than

did other brands. Clorox thereupon prepared demonstration kits that it furnished to some of its broker representatives, along with an instruction sheet that showed them how to prove to the trade that Clorox was stronger and faster-working that Purex and the other liquid bleaches. One of the printed instructions cautioned, "do not leave both samples on the table or in view, as both will eventually turn the same color." The demonstrations apparently were conducted several times in about 1964–65 for the "education" of the retail trade, but they were not directed toward consumers.

Purex responded with a litmus test of its own that was designed to expose the "fraud" of the Clorox demonstration. The Purex assessment of these competitive demonstrations at about the time they were occurring is set out in the final paragraph of a memorandum written by one of its principal executives on November 15, 1965:

"It is doubtful the CLOROX demonstration will have had a great impact upon the trade. They have tried it before in other Purex markets with no success! Last year in Los Angeles, for example, we found that we were very effective in turning the tables on them by explaining to the trade what the actual demonstration represented. When we conducted our own demonstration and proved to them that the conclusions reached by CLOROX were untrue, we found many of the customers were upset with their CLOROX representatives. We felt that our own demonstration was quite effective on scoring a slight advantage over CLOROX and in a very short time CLOROX stopped using their demonstration." (Exhibit W).

On the whole, this seems to be a rather good analysis, and the matter of the battle of the litmus tests will be given no further consideration in this litigation.

E. *The "Thrashing" At Erie.* In October 1957, Purex undertook to establish its liquid bleach in the retail grocery stores of Erie, Pennsylvania, where it had not previously been operating and where Clorox was well entrenched. From the outset, Purex spent in the Erie market, in advertising and coupon discounts, over $3.00 per case sold, as compared with its normal rate of less than six cents. As a result, Purex obtained initially almost complete distribution for its product among the stores of Erie and a market share of more than 30%.

Clorox promptly responded with advertising and promotion expenditures of its own, totaling about ninety cents per case, which were principally in the form of price reductions of from three to seven cents, depending upon the size of the bottle, and the sale of ironing board covers and damping bags at minimal prices upon presentation of a Clorox label. The normal profit to Clorox per case is about forty cents. One of the plaintiff's contemporaneous documents asserts that the total Purex advertising and promotional expenditures in the Erie test market during the five months following entry were $21,717.00, as against $6,527.00 spent by Clorox. (Exhibit BX).

The Purex share of the market in Erie soon went down to about 10% and remained at approximately that level until Purex withdrew from that area, in about March 1959.

Purex now refers to the response by Clorox to its entry into Erie as a "thrashing," and as an anticompetitive predatory practice designed to prevent a new competitor from getting a foothold in that market. The plaintiff, through its expert witnesses, contends that Clorox, because of its dominant position, had an obligation to give Purex, a newcomer, an opportunity to get established in Erie before responding to the challenge. Just how long Clorox should have had to wait, and what competitive steps it then might properly have taken in order to preserve or regain its market share, are not suggested.

In his opinion upon which the divestment order here concerned was based, Commissioner Elman considered at length the fact that the presence of a strong firm in a market makes it difficult for a new competitor to gain entry. In the course of the

discussion, he pointed out that "To justify such an investment, the entrant must be in a position to obtain a large market share within a reasonable period of time. In these circumstances, the entrant is not only being made to play the competitive game for high stakes, but, by being forced to enter on a large scale, he is virtually insuring a swift competitive response by the established firms. They might tolerate the obtaining of a small foothold by a new entrant, but they can hardly sit by while a large share of the market is absorbed by the newcomer." 63 F.T.C. 1534, 1552 (1963).

It is one thing to say that, as a matter of public policy, an established firm should not be allowed to become so strong through merger that by its very presence it tends to discourage new competitive entrants. This is one of the thrusts of section 7. It is quite another proposition to assert that the established firm must respond in damages because, before any adjudication of a violation of that section, it declined to sit by and watch the newcomer absorb a large share of its market. The principle that an established firm may use all fair means to protect its market has long been accepted in the business community. This principle was expressly enunciated by Purex in the minutes of a conference of its executives, held at Ojai, California, in April 1954. That document recites, under the heading of liquid bleach: "The following agreements were reached on this subject: a)—that we will meet all active competition with some counter-promotion . . . . . . couponing, etc., store sales or other . . . . . . to protect our position in the markets." (Exhibit BQ, page 6).

█ I can find nothing reprehensible or anticompetitive in the Clorox response in Erie. For that firm to spend ninety cents per case in advertising and promotions might be called "sharp shooting," as the plaintiff terms it, because Clorox was never known previously to spend in excess of its profit for such purposes. However, for Purex to come in with expenditures in excess

of $3.00 was also unprecedented, and an unusually large attack may be expected to elicit a comparable response.

In contrast to the plaintiff's present contentions, the Purex officials did not consider the Clorox response to their entry in Erie to be inordinately strong at the time it occurred, and there was no current suggestion that such response had anything to do with the decision to withdraw. Several documents from Purex files discuss the Erie experience. The general conclusions were that for Purex to have gained and held a 10% share of the market was a satisfactory accomplishment, particularly in view of the fact that the innovations of a new bottle with a "coffee pot" handle and the "foaming" characteristic of the bleach that Purex had sought there to introduce did not prove popular enough to justify the increase in prices that accompanied them.

A memorandum of a Purex Marketing Strategy Committee meeting on February 5, 1959, states that " . . . it was agreed that we should withdraw from the Erie Test Market on Liquid Bleach because of the problems associated with drop shipping the stores in this area which over an extended period of time results in dissatisfaction on the part of the Trade with this method of handling." (Exhibit 1640).

During the sixteen months that Purex was trying to establish itself in Erie, another competing brand, Austin's, increased its market share from 5% to about 24%, despite the activities of Clorox that Purex now claims were so predatory and monopolistic.

From all of the large amount of evidence pertaining to Erie, the conclusions drawn by this court are that Purex went into Erie expecting that it would be met with a response by its competition, including Clorox; the response by Clorox was not inordinate, in view of the advertising and promotional expenditures by Purex; and that the principal reasons for the Purex withdrawal from Erie were unrelated to any actions by Clorox. To whatever extent the Clorox response may have encouraged the Purex withdrawal, such circumstance cannot be

charged to the merger. Clorox did nothing in Erie that it could not or presumably would not have done had the merger never taken place.

F. *The Washing Machine Cooperative Program.* Beginning in about 1958, Clorox started proposing to washing machine manufacturers a cooperative program under which the latter would include liquid bleach dispensers in their manufactured products, along with promotional materials describing how the washing process could be enhanced by proper application of liquid bleach, particularly Clorox. By 1964, about 85% of the manufacturers of washing machines sold in the United States were participating in this program.

The plaintiff points out that Clorox never had engaged in such activity prior to the merger and that its washer-cooperative program stemmed from Procter's earlier participation in comparable programs with the same manufacturers in promoting its soaps and detergents.

There is no doubt but that the inspiration for this activity by Clorox came from Procter, and that its success was enhanced by Procter experience and research. However, I cannot agree with the plaintiff that such a program was in any way anticompetitive. Due to earlier monitoring by the Federal Trade Commission, the relationships that Clorox established with the manufacturers were not exclusive, and the promotional materials placed in the washing machines at time of sale asserted or implied that Purex and the other liquid bleach products shared with Clorox the ability to produce the claimed superlative effect upon machine-washed clothes.

■ Insofar as we are aware, Purex could have established similar relationships with the washing machine manufacturers if it had chosen to do so and had gotten to them first. In fact, Purex engaged in, or at least planned for, its own cooperative program with washing machine manufacturers for the benefit of its dry bleach products. (Defendants' Exhibits CD and BO).

G. *The "Attack" On Purex In Its Home Territories.* The plaintiff complains that soon after the merger Clorox recognized that Purex was its only competitor on a national scale that had enough money, sophisticated marketing, and capacity for growth to provide a serious challenge to Clorox, and that the decision was thereupon made to keep Purex busy and in its own areas in order to frustrate its expansion into other markets. Such a battle plan and the occasional war cries that were emitted to keep up enthusiasm for it, came principally from memoranda prepared by the advertising agency employed by Clorox, rather than from executives of that company. However, even acceptance of the asserted plan at face value discloses no more than a determination vigorously to compete and to gain market share at the expense of a competitor.

■ As a prime revelation of predatory intent on the part of Clorox, the plaintiff makes frequent reference to a portion of an outline that was prepared in 1966 for use by a Clorox division sales manager in a presentation to a meeting of Clorox distributors:

"Clorox position—*defend* and *protect* our business. Purex will hurt *you* only if *you* let them. Clorox will supply the gun, but *you* must pull the trigger." (Exhibit 1466).

Neither such comments nor the actions of Clorox that might be inferred to have been in furtherance thereof disclose any intention to monopolize or otherwise to deprive Purex of the means of continuing its business. A comment by Judge Merrill in announcing the decision of the court in *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971) has particular significance here.

"Dahl's attempt-to-monopolize claim rests entirely on its allegation that an employee of Cooper told an employee of Dahl that Cooper would drive Dahl out of business if Dahl chose to compete. Such a manifestation of intent to triumph in the competitive market, in the absence of evidence of unfair, anticompetitive or predatory conduct, is not enough to establish a violation of § 2."

IV. PUREX'S COMPARATIVE INFERI-
ORITY IN MARKETING LIQUID
BLEACH STEMMED PRINCIPALLY
FROM DECISIONS OF ITS OWN
MANAGEMENT, RATHER THAN
HAVING BEEN IMPOSED BY CLO-
ROX.

■ Throughout the period of the merg-
er, Purex was a successful and ably man-
aged corporation. Its annual pre-tax prof-
its increased rather steadily from about $3.6
million in 1958 to $19.5 million in 1967.
(Exhibit DE). During the same period, its
pre-tax profits from the sale of its branded
liquid bleach also showed steady improve-
ment, growing from $1.7 million in 1958 to
$2.7 million in 1965.[2] (Exhibit DS). This
latter rate of increase was not as large as
that enjoyed by the corporation as a whole,
and the Purex share of the combined Pu-
rex-Clorox market for liquid bleach in the
Purex area of distribution went down from
43.7% in 1958 to 37% in 1967. (Exhibits
1650, Table 4F).

The plaintiff now seeks to recover dam-
ages from the defendants because of this
reduction in market share. In order to hold
the defendants liable, the plaintiff must
show that their illegal conduct *materially
contributed* to the comparative decline that
Purex suffered in its liquid bleach business.
See, *Weiman Co. Inc. v. Kroehler Mfg. Co.,*
428 F.2d 726, 729 (7th Cir. 1970). The ina-
bility of this court to accept the plaintiff's
contention that the plaintiff's problems
were caused by the merger or by any other
conduct of the defendants cognizable under
the antitrust laws has already been dis-
cussed in this memorandum. Clorox in-
creased its ascendancy over Purex during
the period of the acquisition principally be-
cause it simply did a better job in market-
ing liquid bleach, just as it had done before
the acquisition. But even if some of the
conduct of Clorox were to be deemed to
have been causally related to the acquisi-
tion or otherwise anticompetitive, any ef-
fect that it may have had upon the plaintiff

was far outweighed by the sum of a series
of actions and policies undertaken by the
plaintiff.

A. *The Plaintiff's Diversification Pro-
gram Was Achieved At The Expense Of
Maximum Development Of Its Liquid
Bleach Business.* In about 1946, Purex
management adopted the strategy of
growth through product diversification,
rather than remaining a one product com-
pany. This strategy was vigorously carried
out, with the result that by 1968 Purex was
marketing more than thirty additional
products, most of which were obtained
through acquisitions of other companies.
By about 1953, Purex had adopted the poli-
cy of marketing and advertising its house-
hold products as a "family of brands," and
it used profits from the sale of its branded
liquid bleach to subsidize the development,
marketing and advertising of the other
members of the "family."

As has been noted above, the strategy
worked very well in the financial interests
of the plaintiff corporation as a whole. But
it deprived Purex liquid bleach of the pro-
motional and advertising funds that it
needed in order to increase, or even main-
tain, its share of the market. The effect
upon Purex liquid bleach was as might be
expected, and danger flags were hoisted
from time to time within the corporation.
In October 1956, the plaintiff's marketing
experts made a detailed written presenta-
tion on liquid bleach which adverted to the
fact that during the past four years Purex
had steadily lost market share, not only to
Clorox but to the "all other" category of
manufacturers as well. The study then
stated that "We have all been aware of this
problem of a slowly disappearing market
share, and there are several reasons behind
it. We know, for example, that as a matter
of policy we have devoted a considerable
portion of the advertising funds earned by
liquid bleach to the development of other
brands of the corporation. As a matter of
fact, this chart shows the relative expendi-

**2.** The 1966 and 1967 profits from Purex brand-
ed bleach dropped to $386,000 and $527,000
respectively. This reduction appears to have

been due principally to the large expenses in-
curred in eastern expansion during those years.

tures of Clorox and PUREX; and, in the most recent year—which is the most favorable comparison, we are spending only about ⅕ of the money that Clorox is . . . ." (Exhibit 1622, pages 2–3).

In April 1957, Jack Northrup, the Purex sales manager, wrote in a memorandum that advertising support was badly needed for Purex liquid bleach " . . . because this brand has been milked so badly in past years and results are now becoming apparent in loss of market position." (Exhibit 1626, page 2). A few months later, in August, the very month in which the acquisition of Clorox by Procter occurred, a management committee of Purex, the Marketing Research Action Committee, noted in a memorandum:

"*Problem*: During the past year liquid PUREX has slightly lost both share of volume and share of families buying. This decline during the past year is part of the long-term three or four year PUREX decline which we have noticed from Nielsen reports.

"*Discussion*: It was felt that the basic cause of this decline was lack of advertising expenditures over a long period of time. The money that this brand earns has not been returned to the brand because it has been a policy of the corporation not to spend any money on this brand until there is something really worth advertising. (In the past it had been found that advertising Liquid Bleach in its current form proved to be rather unproductive.)" (Exhibit HO) (see also Exhibit AO).

Despite these and other expressions of concern, the marketing expenses for Purex liquid bleach continued at a greatly reduced level through 1964. Although sales of Purex liquid bleach suffered because of this lack of support, the corporation was willing to accept the resulting disadvantage, inasmuch as the diversion of funds to aid the development of other products produced such pleasing results. Thus, in 1965, Mr. A. C. Stoneman, the chief executive officer, reported that the "past 10 years of Purex growth is evidence of the success of our long-range plans for expansion of Purex

into a multi-product, diversified, national and international marketer."

Throughout the years between about 1953 and 1964, when Purex was withholding adequate market support from its liquid bleach as part of its corporate strategy, Clorox continued to maintain a comparatively strong advertising program for its sole product. (Exhibit ATX). These circumstances constitute the principal reason for the Purex decline in market share during the period of the acquisition.

B. *The Plaintiff Sought To Promote Its Dry Bleach At The Expense Of Liquid Bleach.* One of the plaintiff's products that it tried hard to promote during the period of the acquisition was its dry bleach that it called "Beads O' Bleach." Between 1958 and 1964, more than 30% of the sales revenue from this product were devoted to such promotions. This was made possible by cutting the expense of advertising liquid bleach to about 5.5% of its gross sales. (Exhibit ATX).

The attitude of the Purex Company with respect to such a policy was made clear at the outset in a January 4, 1956, memorandum by one of the Purex executives. He referred with approval to the idea of mounting a major advertising campaign in support of Beads O' Bleach and then said that such a plan

" . . . means that liquid bleach would be without advertising pressure, except as it benefited from the reminder value of the name 'Purex' in Beads O' Bleach advertising. We plan to strongly emphasize the name 'Purex' in all Beads advertising and, of course, in Purex Dry Bleach copy. By eliminating liquid we can strengthen our Purex dry bleach advertising story, which is now emasculated by the forced combination with liquid.

"Lack of advertising on Trend and liquid bleach for this period might do some damage to their sales and brand position. But we believe the risk is least on these brands, and one we can live with. It will have the smallest adverse effect on company profits, and offers a chance for important contributions to profit from

Beads and ODC if we can get these brands moving up." (Exhibit AL).

The advertising campaign that Purex mounted on behalf of its dry bleach during the years of the merger was largely devoted to trying to persuade the public to use Beads O' Bleach *instead* of liquid bleach. Thus, support was taken from Purex liquid bleach in order to finance a sales program that was designed to harm the very source of its funds. To whatever extent such a program was successful, Purex is hardly in position to charge the defendants with responsibility for the resulting loss of sales of Purex liquid bleach.

C. *Liquid Bleach Sold Under Private Label Cut Into The Plaintiff's Branded Liquid Bleach Market.* Another way in which Purex enhanced its corporate profits at the expense of its branded liquid bleach was its practice of manufacturing liquid bleach for sale by chain stores under their private labels. During the entire period of the merger, Purex was the nation's principal supplier of private label bleach, and it sold ever-increasing quantities to more and more customers. Practically all of these customers operated chain stores, and they quite naturally gave preferential sales promotion treatment to their private label bleach. As early as 1959, the national sales manager of Purex wrote a memorandum in which he adverted to the "mounting inroads" into the Purex liquid bleach market brought about by the continued growth of "private label." He proposed a solution to this dilemma that would involve accepting a new customer for private label bleach only after careful assessment of whether such customer could get it elsewhere and whether supplying the customer with private label bleach would increase his total business with Purex. (Exhibit S).

Despite any occasional attempts to control the proliferation of private label bleach, Purex continued to increase this phase of its business. The fact that such activity was seriously harmful to sales of Purex branded bleach is clearly established in the record. For example, on November 5, 1963, a staff memorandum submitted to the head of market research for the Purex Corporation contained an analysis of the Nielsen Reports for the years 1961 to 1963. The memorandum expressed the concern that Purex was losing its share of the chain store market business to the private labels and asserted the belief that Clorox faired better from such competition because "Purex appears to be a more substitutable brand than Clorox." (Exhibit DH).

On June 8, 1964, a Purex executive wrote in a memorandum that "I don't think there's any more important project than that we learn how to successfully sell Purex Liquid Bleach to the consumer in the face of increasingly vigorous Private Label competition and the increased price spread that now exists between Purex and Clorox and Private Label brands." (Exhibit AP).

As has been discussed earlier in this memorandum, the market share of the plaintiff's branded bleach declined rather steadily throughout the period of the merger, while the Clorox share increased. However, during the same period, sales of private label bleach increased much faster than did those of Clorox, a fact that reaffirms the validity of the above-mentioned concerns expressed by the plaintiff's executives that the loss of market share on Purex branded bleach was more to private label than to Clorox.

V. THE CLAIM OF PUREX THAT ITS NATIONAL EXPANSION PLANS WERE FRUSTRATED BY ITS FEAR OF POST–MERGER CLOROX IS PRINCIPALLY AN AFTERTHOUGHT INDUCED BY THE CONTEMPLATION OF THIS LITIGATION.

Another factor that prompted the divestment order, according to Commissioner Elman's opinion, was the concern that "Given Procter's materially greater strength, compared to Clorox, as a liquid bleach competitor, vigorous competition by the small firms in the industry would appear still more effectively and substantially inhibited than prior to the merger." (63 F.T.C. at 1568). The Supreme Court opinion by Justice

Douglas affirming the FTC decision agreed that "the substitution of the powerful acquiring firm for the smaller, but already dominant, firm may substantially reduce the competitive structure of the industry by . . . dissuading the smaller firms from aggressively competing." (386 U.S. 568 at 578, 87 S.Ct. 1224 at 1230, 18 L.Ed.2d 303).

The plaintiff now insists that the Procter/Clorox merger did inhibit Purex from "aggressively competing," just as the FTC and the Supreme Court had envisioned. According to the plaintiff, Purex was ready to launch a major program of expansion into the eastern areas of the United States early in 1958. Then came the massive predatory attack by Clorox upon Purex in Erie, and that experience, coupled with Purex management's knowledge of Procter's immense market power, impelled Purex to the realization that it would be impossible for it to carry out its expansion plan, and so it deferred them indefinitely. (Plaintiff's proposed findings, page 242). The plaintiff seeks to recover damages for the millions of dollars that it estimates it would have earned in additional profits had it been able to pursue its eastern expansion as scheduled.

This court is unable to accept the plaintiff's claim, for several reasons. In the first place, the Clorox response in Erie was neither predatory nor massive, under the circumstances. This conclusion has been discussed earlier in this memorandum and needs no further amplification here.

A second reason for questioning the plaintiff's contention is that the contemporaneous actions and documents of Purex give no sign of this all-pervading fear of post-merger Clorox that is now reported to have frustrated the Purex expansion plans.

Mr. A. C. Stoneman, who was chief executive officer of Purex in 1958 and for several years before and after, testified that the experience in Erie taught him that Purex could not hope to compete with Clorox on a national basis. But if that was his attitude then, it is strange that he kept it so much to himself, for neither he nor anyone else in the Purex management gave any current indication of having been given any such traumatic lesson. In August 1958, within six months after the reportedly discouraging experience in Erie, Mr. Stoneman began negotiation for the purchase of the John Puhl Division of Sterling Drug, Inc. The John Puhl Division was the fourth largest manufacturer of liquid bleach in the country and had plants in Illinois, Ohio and Virginia. According to a memorandum written by Mr. Stoneman at the outset of such negotiations, he "explained" to the owner that "we were still interested in expanding our liquid bleach business from our area position to a national one;" and that " . . . we were interested in investigating the possibility of purchasing a position in markets where we did not now distribute liquid bleach prior to making plans for expansion by other means." (Exhibit BT).

One month later, Vice President Davidson submitted to Mr. Stoneman a memorandum which recommended the acquisition of the John Puhl Division " . . . as the most feasible step toward nationalizing Purex liquid bleach by expansion into non-Purex areas." (Exhibit CF, page 5).

The acquisition was made in October 1958 for a price of $4 million. One year earlier the asking price had been $3 million, which Mr. Stoneman then thought "sounds high." Such a transaction and the expressed reasons for it are hardly indicative of a company that has been so intimidated by the implied threats of its larger rival that it is afraid to advance into new areas.

In March 1959, the Administrative Committee of Purex prepared a sales forecast for fiscal 1960. It stated the two major problems facing Purex liquid bleach to be "(1) an upsurge of private label brands combined with (2) the forceful marketing strategy of Clorox." However, it expressed the belief that the forthcoming Purex marketing strategy would be able to make progress in solving these problems, and it referred to the matter of expanding into eastern markets and Florida as "open." (Exhibit BG, page 059).

Purex intracompany memoranda between the late 1950s and about 1965 made frequent mention of the hope and expectation of taking liquid bleach into eastern markets. However, these expressions usually acknowledged the need, first, to find a new innovation for the product and an improved means of packaging it. One of the disappointing by-products of the test market in Erie was the realization that the adding of a foaming aspect to the bleach and the use of a new glass bottle with a "coffee pot handle" did not prove to be as popular as had been hoped. And so, the search continued for the "perfect package" and for a better innovation for the product as conditions precedent to direct eastern expansion. The importance of such a search was emphasized by Mr. Stoneman at the annual stockholders' meeting in October 1962. He was asked if Purex planned to expand its present markets " . . . so as to have national penetration of all Purex products." His response: "Our basic marketing strategy is to expand distribution of our products geographically or to reach for a larger share of existing markets when we have a product or packaging innovation to aid us in accomplishing our goals. It is relatively inexpensive to expand a product's position during a period of change as compared to the high cost of expanding market shares when the product type is static. If you try to expand your market share when the product is static you are engaging in a toe-to-toe slugfest with your competition and this is not the way to increase a corporation's net earnings." (Exhibit BL, page 31).

At the same meeting, the chairman of the board of Purex gave another significant answer to a similar question: "Eventually we will be national on bleach but we are not going to . . . make a three, four or five-year investment in this distribution in order to be national when we can get so much better return by putting this same money into other products. Eventually we will be national." (Exhibit BL, pages 55–56).

Two years later, at the 1964 stockholders' meeting, management again was asked if Purex intended to market its liquid bleach nationally. The response was given in a letter by Vice President Davidson: "If we wanted to spend the money to get national distribution on liquid bleach we could get it. But it would take a lot of money to enter markets where other brands have been entrenched solidly with retailers and consumers for many years, and we can make more money by going into other products, for example, promoting dry Beads O' Bleach." (Exhibit BK).

In about 1965, Purex came up with six percent bleach, which it proclaimed as "truly something far greater than just another liquid bleach." (Exhibit 1420, defendants' brief, page 141). At about the same time, Purex was able to produce satisfactorily a new plastic bottle that it had been working on for several years. Having found the product innovation and new package for which it long had been searching, Purex carried its liquid bleach into several of the southeastern states, and, in 1967, it went into the northeastern part of the country.

The record shows that during this entire period between 1958 and 1967, the Purex executives and the salesmen in the field wrote many communications concerning the hopes, problems, triumphs and frustrations that were experienced in contemplating, planning and carrying out the program of eastern expansion. There are frequent references to Clorox, sometimes as a major competitor, and sometimes as not having been as formidable as had been anticipated. But nowhere in the record of those years is there any suggestion that Purex must curtail its plans because of the thrashing that it otherwise would be bound to receive from Clorox under Procter ownership. The record in this case impels the conclusion that the timing and the manner in which Purex entered new markets were dictated by its own strategy as to what would be best enhance the progress of the company, and that fear of Proctor/Clorox played no significant part in these decisions. This court finds the conclusion inescapable that

the plaintiff saw in the divestment order an opportunity to use its newly discovered and retroactive fear as a means of obtaining a multi-million dollar windfall recovery from the defendants. The antitrust laws are little served when used in such manner.

There is an alternative reason why I cannot accept the plaintiff's claim that it should be entitled to damages because fear of the combination of Procter and Clorox discouraged Purex from competing vigorously. I can find nothing in the law, in the relevant reported decisions, or in elemental concepts of justice that would warrant giving such monumental rewards to the fainthearted.

As Commissioner Elman well stated in the opinion that inspired this litigation, "A market in which one firm enjoys, say, a share of 70%, with the balance divided among a number of other firms, will still exhibit the characteristics of oligopoly. The leader will have the kind of market power that compels his rivals to take his reactions into account in their business planning, and his disproportionate strength will tend to deter his small rivals from vigorous competitive activity." (63 F.T.C. at 1551). In a country whose economy is based upon a recognition of the value of free and open competition, these considerations provide ample justification for rendering unlawful a merger that might tend to create such an oligopoly, as Congress did in enacting section 7. But the purpose of that statute is prophylactic, not punitive; and its use in the proceedings that inspired this action was solely to forestall the possibility of anticompetitive activity or a tendency toward monopoly in the future.

The plaintiff places heavy reliance upon an opinion from the Third Circuit in *NBO Industries Treadway Cos., Inc. v. Brunswick Corp.*, 523 F.2d 262 (3d Cir. 1975), certiorari granted sub nom. *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311 (1976). There, the plaintiff, the owner of bowling alleys, contended that if certain competitors had not been acquired by the defendant, in violation of section 7, they would have failed and

that their patrons thereby would have been acquired by the plaintiff. Money damages were awarded in the trial court, and although the Third Circuit reversed and remanded on other grounds, it did support the plaintiff's right to damages by holding " . . . that a horizontal competitor of a company acquired by a deep pocket parent in violation of § 7 can recover damages under § 4 if it shows injury in fact causally related to the violator's presence in the market, whether or not that injury flows from or results in an actual lessening of competition." (523 F.2d at 273).

*Treadway* is the only case of which I am aware that suggests that damages may be recovered for a section 7 violation, even in the absence of anticompetitive conduct. There was no such anticompetitive conduct here, and if the above-quoted comment may be inferred to apply to a situation in which the only causal relationship between the violator's presence in the market and the claimed injury is the plaintiff's fear of the violator's prospective competition, I cannot accept the proposition.

Clorox, before the acquisition, had the right to compete vigorously against Purex and all other bleach manufacturers, no matter how successful it might become in so doing and no matter how much its success might discourage its more timid competitors. Post-merger Clorox competed after the merger in substantially the same manner as before; a bit more aggressively, perhaps, but strictly within the rules of the marketplace, and in no sense did it act beyond the capabilities that it had before the acquisition.

In acquiring Clorox, Procter knew that it assumed the risk of an adjudication of a section 7 violation and a resulting divestiture order. But it is quite another matter to hold that Procter also assumed the risk of being liable in damages to all of Clorox's competitors in amounts equal to three times the profits they might show that they could have earned had they not been afraid to try harder. Such a liability would be an extremely large price to pay for having made

a bad guess as to how the FTC and the courts would view the merger, several years after it had occurred. Not all mergers are anticompetitive, and the prospects of such traumatic liability stemming from an adverse decision would likely prevent many a merger that would have been fully consistent with the public interest.

The doctrine urged by the plaintiff would encourage a competitor, when challenged by a merger, to develop or simulate an attitude of fear and do nothing in the hope of recovering damages for loss of profits that he would have refrained from trying to earn. If the merger is ultimately upheld, the timid competitor has lost much needed ground to his rival. On the other hand, if damages are recovered, they are either a windfall or an unprecedented reward for being fainthearted. In either event, the concept of a cause of action for damages occasioned by fear of a business rival is contrary to the long established principle that the public interest is best served when the challenge of strong competition is met head-on.

## VI. NO VIOLATIONS OR ATTEMPTED VIOLATIONS OF SECTIONS ONE OR TWO OF THE SHERMAN ACT HAVE BEEN ESTABLISHED.

In view of all that has been said in this memorandum, little additional comment is needed in rejecting the plaintiff's claim of violation by the defendants of section 1 of the Sherman Act (15 U.S.C. § 1). There is no showing that Procter combined with Clorox or anyone else in restraint of trade. The record discloses no tying arrangements, no unlawful use of trade secrets, and no control of raw materials or advertising. Post-merger Clorox simply engaged in vigorous but fair competition after the merger in the same manner as before.

By the same token there was no monopoly or attempted monopoly in violation of section 2 of the Sherman Act. Nor would any attempt at such monopoly have substantial prospect of success, for, as the evidence showed, the liquid bleach business is hardly conducive to monopoly. The product is easy and inexpensive to make from raw materials that are readily available, and there are no patents or similar barriers to entry. Inasmuch as liquid bleach is relatively inexpensive and an item of frequent purchase, the housewife has repeated opportunities to transfer her patronage as promotions and price reductions and new offerings may tempt her. Throughout the period of the merger, many smaller brands competed successfully with Clorox in their respective local regions, and the growth in market share of private label, most of which was manufactured by the plaintiff, exceeded that of Clorox in some areas of the nation.

As has been discussed at length above, post-merger Clorox took market share from Purex simply because it did a better job of marketing. This cannot be equated with the type of monopolistic activity that calls for antitrust damages. *See, Telex Corp. v. International Business Machine Corp.*, 510 F.2d 894, 928 (10th Cir. 1975).

## VII. CONCLUSION.

Judgment will be entered in favor of the defendants. This memorandum will constitute findings of fact and conclusions of law, as authorized by Rule 52(a) of the Federal Rules of Civil Procedure.